APCO OIL CORPORATION *v.*
Harvey B. STEPHENS, d/b/a APCO MARINE

CA 80-168                                      606 S.W. 2d 134
Court of Appeals of Arkansas
Opinion delivered October 15, 1980

*Martin, Vater & Karr*, by: *Richard L. Martin* and *Charles Karr*, for appellant.

*Garnett E. Norwood* and *Smith, McClerkin, Dunn & Nutter*, by: *Charles A. Morgan*, for appellee.

STEELE HAYS, Judge. For a number of years, APCO Oil Corporation has owned an automobile service station at DeQueen, Arkansas, for the retail sale of gasoline and petroleum products. In 1970, their operator terminated his lease, so APCO approached Harvey B. Stephens about taking over the station. Stephens agreed to do so and the parties entered into a "Service Station Consignee Agreement," dated December 29, 1970. Stephens bought certain unspecified merchandise, stock and equipment from the withdrawing operator. On August 25, 1971, the parties executed a "Motor Fuel Consignment Agreement" and on September 1, 1971, a "Consignee Service Station Lease." These instruments comprised the written contracts between the parties. All agreements were signed by Harvey B. Stephens as a lessee-consignee and by P. J. Merchant on behalf of APCO Oil Corporation and were witnessed by Ben F. Harrison, APCO Representative. A provision in the lease provided that after October 30, 1971, the lease would continue from month to month and that either party could terminate by giving the other written notice thereof ten days or more prior to the date such termination would become effective. The Service Station Consignee Agreement and the Consignee Service Station Lease contained provisions that the entire agreements were contained in the written contracts and that no obligation, agreements or understandings would be implied, unless expressly set forth therein.

At the time Stephens took over the service station from the previous operator, the station was being used by Jefferson Bus Lines as a bus station and was also providing a telephone answering service for the DX Propane distributor. Both of these services provided additional income to the service station operator and continued after Stephens took over. APCO was aware of these outside business activities and had no objection to them, though APCO received no direct benefit.

At some time prior to January, 1978, APCO began negotiating with Kerr-McGee Refining Corporation for the sale by APCO of a number of service stations in Arkansas and Oklahoma, including the station at DeQueen. In contemplation of the consummation of that sale, on January 13, 1978, APCO gave written notice to Stephens of termination

of the lease and Motor Fuel Consignment Agreement to take effect on February 15, 1978. The notice was received by Stephens on January 17, 1978.

Stephens called APCO to request additional time to relocate his operation and was told that Bill Gary and Richard Morava, APCO representatives, would come to talk to him. Stephens also talked to Kerr-McGee about continuing in the station as a Kerr-McGee operator. Stephens was contacted by Morava and Gary and by representatives of Kerr-McGee, but no specific understanding was reached with either. It appears that on February 17, 1978, a Kerr-McGee distributor from Poteau, Oklahoma, came to DeQueen to discuss with Kerr-McGee representatives the possibility of operating the station as a Kerr-McGee outlet. Negotiations between the distributor and Kerr-McGee did not materialize and the Kerr-McGee distributor informed Stephens that Kerr-McGee wanted too high a price and that he was not interested. On the same day Kerr-McGee representatives locked the gasoline pumps, effectively terminating Stephens' operation. As a consequence of the closing of the station, Jefferson Bus Lines and the DX Propane distributor moved to other locations.

On March 22, 1978, APCO filed suit to eject Stephens from the station. Stephens responded with a counter-claim, alleging that: (1) APCO had not returned a contingency deposit of $2,000.00 due him; (2) that APCO had forced him out of business with no means of disposing of the stock of goods and fixtures due to the "short notice" given him on February 17, 1978; (3) that he was entitled to be paid for certain improvements to the station; and (4) that he had lost his contract with Jefferson Bus Lines due to the "hasty manner" that APCO took over the station. Stephens sought damages of $100,000.00.

After a request for admissions, written interrogatories and discovery depositions, APCO moved for summary judgment, which was denied. The suit was tried on the issues raised in the counter-claim and over objections from APCO, Stephens was permitted to testify that Ben Harrison had told him APCO would purchase his stock and equipment if

someone else took over the station. At the conclusion of the evidence, the trial court directed a verdict for Stephens for the $2,000.00 contingency deposit (which was not disputed) and directed a verdict for APCO on the allegation of the counterclaim for the cost of improving the real property. The trial court denied APCO's motion for a directed verdict relative to the loss of the Jefferson Bus Line and the answering service and, further, denied APCO's motion for a directed verdict on Stephens' claim for recovery of the value of his inventory of stock, merchandise and equipment. APCO's motion was based on the fact that Stephens' had not alleged an oral reformation of the written contract in his counter-claim and there was insufficient evidence of oral reformation. On its own initiative, the court treated the counter-claim as amended to conform to the proof, namely, that the written contract was reformed by the oral agreement by APCO to purchase Stehens' inventory.

The jury returned a verdict in the sum of $7,515.00. APCO moved for judgment notwithstanding the verdict, which the court denied and APCO has appealed, contending that it was error for the court to permit Stephens to testify about oral agreements allegedly entered into with APCO representative, Ben Harrison, prior to the signing of the first contract on December 29, 1970. APCO contends that under the express provisions of the written contracts, any oral agreements were merged into the written contracts and parol evidence is inadmissible to contradict, vary or enlarge the terms of an unambiguous, written contract. Further, APCO contends there was not evidence that Harrison had any authority to bind APCO.

We think appellant's position is well taken. The law in Arkansas and elsewhere is that before the terms of a written contract can be altered or reformed by oral agreement the evidence thereof must be *clear, unequivocal* and *decisive. Realty Investment Company* v. *Higgins*, 192 Ark. 423, 91 S.W. 2d 1030 (1936); *Davidson* v. *Peyton*, 190 Ark. 573, 79 S.W. 2d 734 (1935); *Barton Mansfield Company* v. *Wells*, 183 Ark. 174, 35 S.W. 2d 337 (1931). The rule is that any oral agreements between the parties prior to the written agreement become merged in the subsequent written agreement and parol evidence intended to vary the terms of the writing is incompe-

tent and inadmissible. *Wright* v. *Marshall*, 182 Ark. 890, 33 S.W. 2d 43 (1930); *Beck* v. *Neal*, 228 Ark. 186, 306 S.W. 2d 875 (1957).

It is clear beyond question that the testimony in this case with respect to the repurchase of the inventory falls significantly below anything that could aptly be termed "clear, unequivocal and decisive." More than that, evidence that would hold APCO legally responsible for the loss of the Jefferson Bus Lines contract and the DX Propane answering service is non-existent. Appellee's counter-claim makes no mention of the answering service and no motion to amend the pleadings to conform to the proof was made. Nor does the counter-claim state any actionable cause relative to the Jefferson Bus Lines, only that this business was lost to appellee because of the "hasty manner" in which the premises were taken. However, it is clear that APCO gave Stephens sufficient notice of termination under the agreement and breached no legal duty owing to the appellee, either contractual or tortuous, in connection with the sale of its property at DeQueen to Kerr-McGee Refining Corporation.

Appellee concedes in its brief that APCO had a right under its contracts to terminate the lease with Stephens and that it gave the required notice, but submits that APCO, through its agents, either withdrew the notice to terminate or encouraged appellee not to remove the properties or relocate the business. We are unable to find evidence on which either argument will stand and appellee has cited nothing in its argument on this point except testimony by Stephens that he called APCO to ask for more time to relocate and was told that Gary and Morava would contact him. These two men did contact him, though not until the night before Kerr-McGee locked the pumps, but only to say that APCO had sold to Kerr-McGee, though he was told, he says, by Richard Morava that "The way it looks right now, you'll just continue to operate" as Kerr-McGee. Morava's estimate of that likelihood appears reasonable, as it was not until the following day that the distributor from Poteau rejected Kerr-McGee's terms. But aside from that, Stephen's testimony falls short of providing any verbal withdrawal of the notice to terminate or anything else of substance upon which Stephens

had a right to rely. The court clearly should have granted the motion for directed verdict on the basis of the evidence.

Turning to the inventory, here, too, the evidence fails to meet requirements of the law; see, *Beck* v. *Neal, Supra.* A number of factors substantiate this conclusion: (a) appellee's testimony, rather than being unequivocal and decisive as the law requires, is more nearly the reverse (record, page 225):

> Q. Let me back up. Ben Harrison assured you that if you bought this stock and bought further stock, if you had to get out of there, APCO or somebody would buy your stock?
>
> A. I had mentioned, you know, to Ben, I said, "Hey, what if you all decide, you know, in two months that you don't want me in here, or I don't even want to be in here, am I going to be stuck, you know, with this?" And he said, "No, this is our policy, you know, we do this with all stations, that we don't try. . ."
>
> Q. . . .let me ask you right here, at the final determination here, whichever one that was, did they finally buy your stock?
>
> A. No, sir.

This was the extent of Stephens' testimony on this issue on direct examination, obviously wholly inadequate to create a duty of any kind, even a verbal contract, and certainly nothing in derogation of a written contract. On cross examination, appellee came nearer to meeting the requirements (record, page 242):

> Q. I believe you also testified about the time that you had these negotiations with Mr. Harrison that you bought some equipment and inventory from the operator who was there before you took it over, is that correct?
>
> A. Yes, sir.

Q. Did you buy that direct from the operator?

A. I bought it from Ben. I paid Ben the money, and Ben paid the. . .I guess gave it to the operator, it did belong to the operator, yes, sir.

And at page 243:

Q. Did he tell you that APCO would buy it, or did he tell you that the next operator would buy it like you did?

A. He said that APCO would buy it, yes, sir.

Q. Why would he tell you that APCO would buy it from you, when APCO didn't buy it from the man that you were taking over from?

A. I don't know, sir, he was probably referring to that he would see that it got bought but, you know, I took it that he meant APCO.

Giing such testimony all the credence possible, it cannot measure up to the high standards required by the language of the law: clear, unquivocal and decisive.

We are impressed, too, with the fact that appellee's counter claim makes no mention of any oral reformation or modification, although the pleading expressly deals with the inventory by alleging that Stephens was left with a stock of goods that he had no means of disposing of due to the short notice given on February 17, 1978. While the court cured this issue on its own, we think if appellee had been convinced of the merit of this part of his claim, it would not have been overlooked in the counter-claim.

Finally, it is noteworthy that although present and available (having been subpoenaed by appellee) Ben Harrison was not called to testify. The only inference to be drawn from that is that Harrison's testimony would not corroborate the appellee. *National Life Co.* v. *Bennecke*, 195 Ark. 1088, 115 S.W. 2d 855 (1938); *U.S. Bond & Mortgage Co.* v. *Reddick*, 199 Ark. 82, 133 S.W. 2d 23 (1939).

We need not deal with the argument of appellant that evidence was lacking as to any authority by Harrison to bind APCO, except to observe that the burden of proof was on the appellee to prove that Harrison had either the express or the implied authority to bind APCO by oral agreements, and there was no pleading and no proof relative to his authority. *Taylor* v. *Connell*, 233 Ark. 440, 234 S.W. 2d 4 (1961); *Southern Hotel Company* v. *Zimmerman*, 84 Ark. 373, 105 S.W. 873 (1907).

Reversed and dismissed.

PENIX, J., dissents.

MARIAN F. PENIX, Judge, dissenting. I would affirm the trial court decision with respect to contractual liability but order a remittitur with regard to damages.

I believe the majority, in reversing this jury verdict, has mistakenly applied the parol evidence rule to this contract. While I readily admit parole evidence could not be introduced to alter or vary the terms of the written agreement, I find the evidence to be of an oral agreement supplementing the standard industry or adhesion contract signed by the parties. The Majority, in accepting APCO's position the agreements were meged into the subsequent written contracts and that parol evidence is inadmissible to contradict, vary, or add to the terms of a valid and unambiguous written contract, has failed to recognize and apply the collateral agreement rule. Stephens testified an agent of APCO, Ben Harrison, as an inducement to encourage Stephens to locate his business in the APCO station, agreed APCO would repurchase Stephens' inventory. This was in the event APCO should sell its property while Stephens occupied it. Stephens testified an additional inducement was the continued successful operation of an agreement with Jefferson Bus Lines. There was nothing in the written agreements about repurchase of inventory nor mention of the bus station operation.

A subsequent written contract supercedes previous agreements and expressions which directly relate to the same subject matter as the writing. However, promises which are collateral to an agreement, that is promises which are aux-

iliary to the main agreement are not merged into the written agreement. Stephens contends, and the jury so found, there were two sets of promises or transactions between him and APCO — one set oral, the other written. The determination whether the final writing is designed to supplant the oral agreement or to merely supplement it is a finding for the fact finder to make only after comparing the two.

*John Lane d/b/a Fortune Cattle Co.* v. *Pfeifer*, 262 Ark. 162, 568 S.W. 2d 212 (1978) held parol evidence to be admissible when offered to prove an independent collateral act about which a written contract is silent. See also, *Lonoke Production Credit Association* v. *Pfeifer Milling Co.* 268 Ark. 639, 595 S.W. 2d 223 (Ark. App. 1980). Stephens testified that he and APCO's agent agreed APCO would repurchase Stephens' inventory, stock and equipment; that Stephens would maintain the bus franchise, and that APCO induced Stephens to make improvements when APCO knew the sale of the property was imminent. The written agreement was silent as to whether APCO would repurchase inventory, stock, and equipment. Also it was silent as to the continued operation of the bus line. The written contract was a standard printed form prepared by APCO. Nothing in the oral agreements contradicted the terms of the written agreements. I believe there was evidence from which the jury could have concluded there was a collateral agreement. Hence, I would affirm the trial court's allowance of the testimony regarding the collateral agreement.

While I would affirm the jury's finding as to the collateral agreement, I do believe Stephens has not met his burden of proving damages. The question not only was whether there was an oral agreement to repurchase Stephens' stock, inventory, fixtures or equipment, but whether Stephens had in fact suffered any damages resulting from the breach of the oral agreement. Stephens testified the stock which APCO refused to purchase was worth $4,525.00. Stephens introduced into evidence a detailed list of the stock and value of these items. The jury obviously believed there to be a collateral agreement. This agreement required APCO to repurchase the stock from Stephens. The failure of APCO to repurchase the stock was a breach of contract. Stephens

testified as to the value of the stock. This is evidence of the value or the damages sustained by the breach. An owner is permitted to testify as to value. This evidence can be accepted or rejected by the trier of fact. *Arkansas State Highway Commission* v. *Fowler*, 240 Ark. 595, 401 S.W. 2d 1 (1966).

APCO argues the figure given by Stephens does not reflect the salvage value of the stock. Since Stephens has failed to mitigate his damages, he can recover nothing. I might be inclined to agree with this position had APCO produced any evidence tending to show this. The Restatement, Contracts, § 336 states: (1) "Damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense, or humiliation."

> It is not infrequently said that it is the "duty" of the injured party to mitigate his damages so far as that can be done by reasonable effort on his part. Since there is no judicial penalty, however, for his failure to make this effort, it is not desireable to say that he is under a "duty". His recovery against the defendant will be exactly the same whether he makes the effort and mitigates his loss, or not; but if he fails to make the reasonable effort, with the result that his injury is greater than it would otherwise have been, he cannot recover judgment for the amount of this avoidable and unnecessary increase. The law does not penalize his inaction; it merely does nothing to compensate him for the loss that he helped to cause by not avoiding it. 5 Corbin on Contracts, § 1039, p. 242-243.

Perhaps Stephens could have avoided some of his loss on the value of the stock, but who has the burden of proving he did not mitigate his damages? Once Stephens introduced his evidence with regard to damages, the burden shifted to APCO to prove the figure given did not reflect his true loss or what his loss might have been.

> . . . If, on the other hand, the action is where a recovery of nominal damages may be had, even though no actual damage is recovered (as in trespass or breach of con-

tract), then, if the *defendant* eliminates all the plaintiff's claims for actual damages by showing that the plaintiff by reasonable care could have avoided them, this does not go to the destruction of the cause of action nor prevent a recovery of nominal damages. . . . the doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration. Being thus a matter in "mitigation," it need not be specifically pleaded at all by the defendant.

Nevertheless, though by the better view the defendant need not plead it, he does have the burden of proof. He must bring forward evidence the plaintiff could reasonably have reduced his loss or avoided injurious consequences, and he must finally convince the jury of this in order to succeed on this issue. McCormick, Damages, § 34, p. 129-130 (1930).

The "duty" to reduce or minimize damages goes only to the amount of recovery. It is not an absolute defense to the injury.

The burden is on plaintiff to establish the elements measuring the amount of recovery. . . . The burden is on the defendant to establish his plea of recoupment or set-off or matters in reduction of damages. 17A C.J.S., Contracts, § 591, p. 1149-1150.

In accordance with the general rule, as to avoidable consequences, in case of breach of contract, defendant in an action for breach of contract is entitled to show any matters which go to reduce the amount of loss actually suffered by plaintiff. 25 C.J.S., Damages § 96, O. 1003.

APCO produced no evidence to dispute the damages figure given by Stephens. They did not even cross-examine him as to the figure or ask if he had attempted to mitigate the loss. We could not speculate as to the salvage value of the stock. Many of the stock items listed an APCO brand product. We could not automatically say this has a salvage value. There is simply no evidence the figure of $4,525.00 could have been reduced by reasonable effort by Stephens. Therefore, I would

not say there was no substantial evidence from which the jury could have found the damages to be that stated by Stephens.

I might at this time point out that the majority makes much of the fact that Ben Harrison was in the courtroom and was never called to testify by the plaintiff. Ben Harrison, who was under subpoena, did not arrive at the hearing, until after the plaintiff had rested. Plaintiff had called all his other witnesses and rested subject to calling Mr. Harrison when he arrived. APCO agreed to proceed with its case and did so. After APCO rested its cases, the plaintiff made a decision not to call Harrison. The plaintiff evidently believed, as does this opinion writer, that he had adequately proven his case. At no time did APCO request they be allowed to reopen their case and call Mr. Harrison. It might be noted he was in the court-room subject to being called to the witness stand by either party. One might infer APCO knew Harrison's testimony would not supports its contentions.

I do find error, however, in the court's submission to the jury on the issue of Stephens' loss of the bus station and the answering service, and the issue of whether Stephens relied upon APCO's agents' statement he would work out arrangements for Stephens to have more time to find another location. The question is not whether APCO had the right to terminate the written agreements with Stephens. This is ap-parent from the written contract. Rather, the question is did APCO, or its agent, verbally withdraw the notice to ter-minate or make statements which encouraged Stephens not to remove his property or to relocate his business thereby resulting in his losing the bus franchise and answering service business. From the record, I find Stephens called APCO's agent Hammett and told him he had to have more time to look for another place to locate the bus station. Hammett ask-ed Stephens how much time he needed and told him he would send two men to talk to Stephens about the problem. I find this to be a far cry from establishing liability in APCO in causing any damages resulting from the loss of the bus franchise. I find the evidence was insufficient to go to the jury and the Court erred in not directing a verdict for APCO. *St. Louis I. M. & S. Ry. Co.* v. *Coleman*, 97 Ark. 438, 135 S.W. 338 (1911).

I do not believe Stephens proved to what extent he was damaged by APCO. The only evidence I find as to the cause of Stephens' loss of the bus franchise and the answering service was the locking of the pumps by Kerr-McGee representatives — not by APCO. I find no evidence going to show that agents of APCO caused the loss of the bus franchise. There is no evidence establishing APCO's liability in this matter. I believe the Court erred in submitting this matter to the jury.

Finding there to be error with regard to the bus franchise and the answering service, I would reverse the denial of the directed verdict in favor of APCO with regard to these elements of damage. The only element of damage remaining is the repurchase of the stock. I would affirm the finding of liability on the condition Stephens accept a remittitur to $4,-525.00.

For the reasons stated above, I respectfully dissent.